[Cite as *State v. Saylor*, 2019-Ohio-1025.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-14 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-274 |
| | : | |
| FOREST HEATH SAYLOR | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of March, 2019.

. . . . . . . . . . .

SAMUEL ADAM USMANI, Atty. Reg. No. 0097223, Assistant Prosecuting Attorney, Champaign County Prosecutor's Office, 200 North Main Street, Urbana, Ohio 43078
        Attorney for Plaintiff-Appellee

ADAM JAMES STOUT, Atty. Reg. No. 0080334, 2600 Far Hills Avenue, Suite 315, Dayton, Ohio 45419
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

**{¶ 1}** Defendant-appellant Forest Heath Saylor appeals from his conviction following his guilty plea to several drug-related offenses. Saylor contends that the trial court erred by imposing consecutive sentences. He also contends that the trial court considered improper factors in imposing his sentence.

**{¶ 2}** We conclude that the record supports the sentence imposed by the trial court and that the sentence is not contrary to law. Accordingly, the judgment of the trial court is affirmed.

## I. Facts and Course of the Proceedings

**{¶ 3}** In December 2017, members of the Urbana Police Department executed a search warrant at a residence located on Boyce Street. Saylor was inside the residence when the search commenced. Upon entering the home, the police detected a strong odor of marijuana. During the search of an upstairs bedroom, the police found raw marijuana in the closet.[1] They also found a nine-millimeter handgun on the television stand in the room as well as a Glock .45-caliber handgun under the bed. Both guns had loaded magazines, and more ammunition was observed in different places in the room. Also on the television stand were a bowl containing white powder, a metal crushing device, and a pill press.[2] At the bottom of the stand was a small white jar with a

---

[1] It appears from the record that Saylor occupied the upper portion of the residence, while his mother, sister and 5-year-old niece occupied the lower portion.

[2] According to the record, a pill press is used to turn a powdered substance into pill form.

powdered substance inside. The police also found a plastic container containing hashish and a second plastic container with raw pieces of marijuana. Marijuana and marijuana paraphernalia were found around the room. A storage box contained a bowl and a rolled one-dollar bill, both of which had a white powder residue.

{¶ 4} In the second upstairs bedroom, the police found raw marijuana scattered around the room and a 5-gallon bucket filled with cut marijuana. The room had multiple pieces of netting hanging from the ceiling.[3] In the upstairs bathroom, the police located blue dye and observed red and blue dye stains on the countertop. There were also various powders and chemicals in the bathroom.[4]

{¶ 5} In the laundry room, police located a prescription bottle containing marijuana, as well as a mason jar later determined to contain a Schedule I controlled hallucinogen. Two pill containers with traces of marijuana were located in the living room.

{¶ 6} The basement was divided into separate areas used for a marijuana growing operation. Three of the areas contained marijuana plants in various stages of growth. The police observed a total of 27 plants. Each of these three areas had its own lighting, water filtration and air filtration systems that were set on different timers. One area of the basement contained potting soil for planting, while another area was set up for drying plants after harvest. Plant food and soil heating pads were located in several areas. The entire basement had ductwork that vented the basement air up through the home's chimney.

{¶ 7} A search of the garage uncovered several marijuana stems, a pot burner, a

---

[3] The record indicates that such netting is used to dry marijuana.

[4] The record indicates that such dyes and powders are used in the manufacture of pills.

mason jar containing large salts, a mason jar containing a dark unknown liquid, and trace amounts of white powder in plastic baggies.

{¶ 8} On March 1, 2018, Saylor was indicted on the following counts:

Counts One and Two - aggravated possession of drugs in violation of R.C. 2925.11(A)(C)(1)(a);

Count Three - possession of marijuana in violation of R.C. 2925.11(A)(C)(3)(c);

Count Four - possession of L.S.D. in violation of R.C. 2925.11(A)(C)(5)(a);

Count Five - trafficking in counterfeit controlled substances in violation of R.C. 2925.37(C) and (H);

Count Six - illegal cultivation of marijuana in violation of R.C. 2925.04(A)(C)(5)(c);

Count Seven - assembly or possession of chemicals used to manufacture a controlled substance with intent to manufacture a controlled substance in violation of R.C. 2925.041(A)(C);

Count Eight - endangering children in violation of R.C. 2919.22(B)(6)(E)(3); and

Counts Nine and Ten - having weapons under disability in violation of R.C. 2923.13(A)(4)(B).

{¶ 9} Each of the counts carried a firearm specification. Additionally, except for Counts Five, Nine and Ten, each of the counts carried a forfeiture of property specification.

{¶ 10} Following negotiations, Saylor entered a plea of guilty to Counts Four, Five, Seven and Eight, as well as the firearm specification attached to Count Seven. In exchange, the State agreed to dismiss the remaining counts and specifications. No agreement was reached regarding sentencing.

{¶ 11} A sentencing hearing was conducted on May 1, 2018. At that time, Saylor acknowledged that he was addicted to heroin. He also admitted that he would purchase heroin and Carfentanil from a supplier in Springfield and that he had a kit for testing its purity. He further admitted that he then converted those substances into pill form, which he sold as the prescription drug Percocet. He claimed that he only made about ten pills per week and that he sold them to people he knew. Saylor also claimed that his buyers were aware of the actual ingredients in the pills. Finally, he claimed that he grew the marijuana for personal use only.

{¶ 12} The trial court sentenced Saylor to prison terms of six months on Count Four, eighteen months on Count Five, eight years on Count Seven and twenty-four months on Count Eight. The trial court also imposed a one-year prison term on the specification to Count Seven. The trial court further ordered that "[t]he sentences imposed in Counts Five and Eight shall be served **CONSECUTIVELY** to one another and **CONSECUTIVELY** to the sentence imposed in Count Seven and Specification 1 to Count Seven but **CONCURRENTLY** to the sentence imposed in Court Four, making a **TOTAL SENTENCE OF TWELVE AND ONE HALF (12 ½ ) YEARS**." (Emphasis sic.) Dkt. No. 30.

{¶ 13} Saylor appeals.

## II.    Recidivism Analysis

{¶ 14} Saylor's first assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT FOUND THE APPELLANT'S LACK

OF INCOME AND EMPLOYMENT STATUS AS [A] FACTOR THAT INCREASED THE LIKELIHOOD OF RECIDIVISM.

{¶ 15} Saylor contends that the trial court erred in weighing the recidivism factors set forth in R.C. 2929.12.

{¶ 16} The standard of review set forth in R.C. 2953.08(G)(2) applies to sentencing challenges. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22. That standard permits us to vacate or modify a sentence only if we find, by clear and convincing evidence, that the sentence is contrary to law or that the record does not support the trial court's findings under certain statutes (including the findings required for consecutive sentences). *Id.* "Clear and convincing" means "[t]he measure or degree of proof that will produce in the mind * * * a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

{¶ 17} R.C. 2953.08(G)(2)(a) does not mention R.C. 2929.11 and 2929.12. Thus, while acknowledging that some sentences do not require any of the findings referenced in R.C. 2953.08(G)(2), the Ohio Supreme Court also reasoned:

> * * * [I]t is fully consistent for appellate courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court. That is, an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by

clear and convincing evidence that the record does not support the sentence.

*Marcum* at ¶ 23.

{¶ 18} A sentence is contrary to law if the sentence falls outside the statutory range for the particular degree of offense or the trial court failed to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors in R.C. 2929.12. *State v. Hinton*, 8th Dist. Cuyahoga No. 102710, 2015-Ohio-4907, ¶ 10, citing *State v. Smith*, 8th Dist. Cuyahoga No. 100206, 2014-Ohio-1520, at ¶ 13-14.

{¶ 19} A "trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give reasons for imposing maximum or more than minimum sentences." (Citation omitted.) *State v. Nelson*, 2d Dist. Montgomery No. 25026, 2012-Ohio-5797, ¶ 62. But "in exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12." (Citations omitted.) *State v. Castle*, 2016-Ohio-4974, 67 N.E.3d 1283, ¶ 26 (2d Dist.).

{¶ 20} A court sentencing an offender for a felony is guided by the purposes of felony sentencing set forth in R.C. 2929.11(A), which states that "the overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." Additionally, the sentencing court must consider the seriousness and recidivism factors set forth in R.C. 2929.12 in determining the most effective way to comply with the purposes and principles of sentencing contained in R.C.

2929.11.

{¶ 21} A review of the record shows that the trial court imposed the maximum sentence allowed for the offenses of trafficking in counterfeit prescription drugs and illegal cultivation of marijuana. The sentence imposed for the offense of possession of L.S.D. was the minimum sentence possible and the sentence imposed for endangering children was a mid-level sentence. All of these sentences were in the appropriate statutory ranges. Thus, on their face, the terms of the sentences were not contrary to law.

{¶ 22} However, Saylor contends that the sentences were contrary to law because they infringed upon his right to equal protection of law. In support, he claims that the trial court improperly considered his financial circumstances as a factor increasing the likelihood of recidivism.

{¶ 23} R.C. 2929.12(D) and (E) enumerate factors to be considered in weighing the likelihood of the offender's recidivism. As set forth in R.C. 2929.12(D), the following factors indicate that an offender is likely to commit future crimes:

(1) At the time of committing the offense, the offender was under release from confinement before trial or sentencing; was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code; was under post-release control pursuant to section 2967.28 or any other provision of the Revised Code for an earlier offense or had been unfavorably terminated from post-release control for a prior offense pursuant to division (B) of section 2967.16 or section 2929.141 of the Revised Code; was under transitional control in connection with a prior offense; or had absconded from the offender's approved community

placement resulting in the offender's removal from the transitional control program under section 2967.26 of the Revised Code.

(2) The offender previously was adjudicated a delinquent child pursuant to Chapter 2151. of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152. of the Revised Code, or the offender has a history of criminal convictions.

(3) The offender has not been rehabilitated to a satisfactory degree after previously being adjudicated a delinquent child pursuant to Chapter 2151. of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152. of the Revised Code, or the offender has not responded favorably to sanctions previously imposed for criminal convictions.

(4) The offender has demonstrated a pattern of drug or alcohol abuse that is related to the offense, and the offender refuses to acknowledge that the offender has demonstrated that pattern, or the offender refuses treatment for the drug or alcohol abuse.

(5) The offender shows no genuine remorse for the offense.

{¶ 24} R.C. 2929.12(E) requires consideration of the following factors indicating that recidivism is not likely:

(1) Prior to committing the offense, the offender had not been adjudicated a delinquent child.

(2) Prior to committing the offense, the offender had not been convicted of or pleaded guilty to a criminal offense.

(3) Prior to committing the offense, the offender had led a law-abiding life

for a significant number of years.

(4) The offense was committed under circumstances not likely to recur.

(5) The offender shows genuine remorse for the offense.

{¶ 25} The trial court found that Saylor was more likely to commit future crimes because he was previously adjudicated a delinquent child, had not been rehabilitated to a satisfactory degree after previously being adjudicated a delinquent child, and showed no genuine remorse for the offense. R.C. 2929.12(D)(2)(3) and (5). With regard to the factors indicating that an offender is not likely to commit future crimes, the trial court found that Saylor had not been convicted of any crimes as an adult and had led a law-abiding life for a significant number of years. R.C. 2929.12(E)(2) and (3).

{¶ 26} Saylor takes issue with the trial court's finding made in regard to R.C. 2929.12(E)(4). With regard to that finding the trial court stated:

The Court gave consideration to whether the offense was committed under circumstances not likely to reoccur. And the Court did not find that factor applicable here because, as we just went through the affidavit of indigency, the Defendant has no employment, no vehicle, does not own a home, and has liabilities, which make it more likely that the Defendant would return to selling drugs in order to support his lifestyle.

{¶ 27} Based upon this record, we cannot say that the trial court improperly considered Saylor's financial situation. In making its statement above, the trial court was not making an affirmative finding that Saylor's lack of income or financial stability mandated a prison term. Instead, the trial court was merely setting forth the reason it did not believe that the factor set forth in R.C. 2929.12(E)(4) was applicable. The finding

was not unreasonable given that Saylor readily admitted that he sold drugs in order to make money to support his own drug habit. Notably, the trial court did not rely on that factor alone in rendering its decision. Thus, we cannot say that the trial court's statement renders the sentence contrary to law.

{¶ 28} When a sentence is not contrary to law, we may only vacate or modify the sentence if we find by clear and convincing evidence that the record does not support it. *Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, at ¶ 7. Having reviewed the record, we cannot say that it clearly and convincingly does not support the trial court's consideration of the statutory principles and purposes of sentencing or the seriousness and recidivism factors as they pertained to the sentences Saylor received.

{¶ 29} The first assignment of error is overruled.

### III.    ORAS

{¶ 30} The second assignment of error asserted by Saylor states:

THE TRIAL COURT'S RELIANCE ON THE ORAS SCORE IN SUPPORT OF ITS SENTENCE IS CONTRARY TO LAW, BECAUSE THE TRIAL COURT MISINTERPRETS THE ORAS RESULTS, AND [THE] ORAS SCORE RELIES ON DEMOGRAPHIC DATA OUTSIDE THE SCOPE OF THE APPELLANT'S CONDUCT AND CIRCUMSTANCES OF THE OFFENSE.

{¶ 31} Saylor argues that the trial court improperly utilized the Ohio Risk Assessment System (ORAS).

{¶ 32} This court has discussed ORAS in *State v. Jennings*, 2d Dist. Clark No.

2013 CA 60, 2014-Ohio-2307:

In 2006, the Ohio Department of Rehabilitation and Correction (ODRC) contracted with the University of Cincinnati, Center for Criminal Justice Research, to develop risk and needs assessment tools that were predictive of recidivism at multiple points in the criminal justice system. Edward Latessa, et al., Creation and Validation of the Ohio Risk Assessment System, Final Report (July 2009), http://www.ocjs.ohio.gov/ORAS/FinalReport.pdf (accessed May 20, 2014). R.C. 5120.114, which was enacted as part of H.B. 86 in 2011, requires ODRC to select a single validated risk assessment tool for adult offenders, to be used by a variety of entities, including courts (when the court orders an assessment of the offender for sentencing or another purpose), probation departments, the adult parole authority, and correctional facilities. ODRC selected the Ohio Risk Assessment System (ORAS), created by the University of Cincinnati. Ohio Adm.Code 5120-13-01.

The ORAS assesses an offender in seven categories: (1) criminal history, (2) education, employment, and financial situation, (3) family and social support, (4) neighborhood problems, (5) substance use, (6) peer associations, and (7) criminal attitudes and behavioral patterns; subsets of neighborhood problems are "high crime area" and "drugs readily available in neighborhood."

Crime statistics concerning neighborhoods (however that is defined), employment history, school attendance, race, gender, age, prior

involvement in law enforcement, and other factors may result in figures regarding the relationship of these factors with recidivism. However, they can often be misleading and biased and based on unreliable (in the sense of not being relevant or accurate predictors of future behavior of a specific individual) facts, and can conflate correlation with causation.

ORAS is a work in progress, and it is not a litmus test for sentencing. Rather, at most, it may be one factor in informing a trial court's discretion in imposing specific methods to address an offender's "rehabilitative needs." Ohio statutory authority and case law place enormous discretion with the trial judge to sentence an offender, and the more sources of accurate information that guide that discretion, the better for the defendant and the community.

*Id.* at ¶ 25-28.

**{¶ 33}** Saylor's overall assessment indicated that he was a "moderate" risk for reoffending.  The trial court noted that this score was "awfully high for somebody who has no adult record and has led a law-abiding life for a significant number of years." Sent. Tr. p. 25.  Saylor claims that the trial court "inaccurately [read] the results of the ORAS" because it "hypothesized" that the score was "abnormally high" "due to the severity of the case."

**{¶ 34}** We find this argument somewhat disingenuous.  The trial court did not state that the score was high due to the severity of the case.   Instead, Saylor's attorney made that statement during the sentencing hearing.  The trial court merely mentioned the score twice during the entire 32-page transcript of the sentencing hearing.   The trial

court noted the score, and then later noted that the score was higher than expected. There was no indication that the trial court placed any importance on the score, and indeed, it appears that the court somewhat discredited the score by finding it to be higher than would be expected. Further, as stated above, the record otherwise supported a finding that Saylor was more likely to re-offend. Thus, we cannot say that the record clearly and convincingly demonstrates that the trial court committed error with regard to the ORAS score.

{¶ 35} Saylor's second assignment of error is overruled.

### IV. Consecutive Sentence Analysis

{¶ 36} Saylor's third assignment of error states:

THE TRIAL COURT IMPROPERLY IMPOSED CONSECUTIVE SENTENCES ON THE DEFENDANT.

{¶ 37} Under this assignment of error, Saylor contends that the trial court erred by imposing consecutive sentences.

{¶ 38} When a defendant challenges a trial court's consecutive-sentence findings, "R.C. 2953.08(G)(2)(a) directs the appellate court 'to review the record, including the findings underlying the sentence' and to modify or vacate the sentence 'if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14 * * * of the Revised Code.' " *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 28, quoting R.C. 2953.08(G)(2)(a).

{¶ 39} "There are two ways that a defendant can challenge consecutive sentences

on appeal. First, the defendant can argue that consecutive sentences are contrary to law because the court failed to make the necessary findings required by R.C. 2929.14(C)(4)." *State v. Adams*, 2d Dist. Clark No. 2014-CA-13, 2015-Ohio-1160, ¶ 17, citing R.C. 2953.08(G)(2)(b) and *Bonnell* at ¶ 29. "Second, the defendant can argue that the record does not support the findings made under R.C. 2929.14(C)(4)." *Id.*, citing R.C. 2953.08(G)(2)(a) and *State v. Moore*, 2014-Ohio-5135, 24 N.E.3d 1197 (8th Dist.).

**{¶ 40}** R.C. 2929.14(C)(4), which is an exception to the presumption in favor of concurrent sentences in R.C. 2929.41(A), provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses

of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 41} The trial court made the appropriate initial R.C. 2929.14(C)(4) findings and then made the R.C. 2929.14(C)(4)(b) finding that "the harm caused by two or more of the multiple offenses * * * was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."   Also, although the Supreme Court of Ohio in *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at syllabus, stressed that a trial court "has no obligation to state reasons to support its findings" in connection with the statutory findings required to impose consecutive sentences, the trial court did make the following finding regarding R.C. 2929.14(C)(4)(b):

Defendant's uninformed and non-scientific method of manufacturing and selling of fake Percocet pills containing carfentanil to an opiate starved community posed a risk of death to unsuspecting first party buyers or third party buyers on the resale market.

{¶ 42} We conclude that the trial court made the required statutory findings; thus, we find no error in this regard.

{¶ 43} Saylor's argument, however, centers on the second basis for attacking a consecutive sentence, that the record does not support the trial court's findings.   In support, he takes issue with the trial court's mention of selling counterfeit pills to an opiate-starved public and argues that there was no connection between his conduct and the

court's finding that the harm caused by the offense was great or unusual. In support, he argues that there was no evidence that his counterfeit drugs were different from other such drugs or that fentanyl is more harmful than other drugs. He also notes that there was no showing as to the strength of his counterfeit pills.

{¶ 44} We begin by noting that it is within the discretion of the individual judge "to determine the weight to assign a particular statutory factor." *State v. Arnett*, 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000). When making such judgments, the sentencing court "is not required to divorce itself from all personal experiences and make [its] decision in a vacuum." *Id.* at 215-216, quoting *State v. Cook*, 65 Ohio St.3d 516, 529, 605 N.E.2d 70 (1992).

{¶ 45} In this case, the record supports a finding that Saylor was making pills by combining heroin with Carfentanil. The trial court was free to take notice of its experience that there is a growing opiate overdose problem nationally, as well as in Urbana, to which the trial court alluded. Further, as noted by the concurring and dissenting opinion in *State v. Woodard*, 12th Dist. Warren No. CA2016-09-084, 2017-Ohio-6941:

> Rising mortality rates due to accidental overdose are due in part to the fact that drug dealers are spiking heroin with much more potent synthetic opioids, such as fentanyl and carfentanil. Synthetic opioids are usually in the form of a white powder and may be indistinguishable from other street drugs. Fentanyl and carfentanil are multiple times more powerful than heroin and can be purchased at a lower cost. The incentive for the dealer is simple. Adding a small amount of fentanyl or carfentanil to heroin is a low-cost way to increase its value. The dealer may take heroin, cut it with a

common filler to increase the volume and then add a more powerful synthetic opioid to maintain high potency. The dealer would then sell the drug to the user who may be completely unaware of the contents.

*Id.* at ¶ 45.

**{¶ 46}** According to the Centers for Disease Control, Ohio and two other states have the highest rate of synthetic opioid overdoses in the country. *See* www.cdc.gov/drugoverdose/data/fentanyl. The synthetic opioid Fentanyl is 100 times more potent than morphine, while Carfentanil is "the most potent fentanyl analog detected in the U.S., [and] is estimated to be 10,000 times more potent than morphine. *Id.*

**{¶ 47}** The record establishes that Saylor combined Carfentanil with heroin and then, using a pill press, turned this mixture into pills disguised as prescription Percocet tablets, which he then sold. Especially since a trial judge need not turn a blind eye to that which is occurring in his jurisdiction, these facts undercut Saylor's consecutive sentence argument. In short, we cannot conclude by clear and convincing evidence that the imposed consecutive service was not supported by the record.

## V. Conclusion

**{¶ 48}** All of Saylor's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. concurs.

FROELICH, J., concurs:

**{¶ 49}** Saylor is a 27-year-old heroin addict, who the court commented has "no

adult record [* * * and] has led a law-abiding life for a significant number of years"; his juvenile record, according to the prosecutor, was "virtually nothing." The prosecutor requested an aggregate sentence of five to seven years, and defense counsel requested a three-year sentence. The trial court sentenced Saylor to 12 1/2 years in prison. Although it found Saylor to be indigent and did not impose the mandatory fine, the court imposed a $500 fine and assessed attorney fees and costs; the court also specifically disapproved a Risk Reduction sentence or placement in the Intensive Program Prison (IPP).

{¶ 50} I have previously voiced my concerns about the almost unfettered discretion available to a sentencing court when the current case law apparently does not permit a review for abuse of discretion. *State v. Roberts,* 2d Dist. Clark No. 2017-CA-98, 2018-Ohio-4885, ¶ 42-45, (Froelich, J., dissenting). However, in this case, the trial court considered the statutory factors in R.C. 2929.11 and R.C. 2929.12, the individual sentences were within the statutory ranges, and the court's consecutive sentencing findings, including the course-of-conduct finding under R.C. 2929.14(C)(4)(b), were supported by the record.

{¶ 51} As for the trial court's consideration of ORAS, the "algorithmization" of sentencing is perhaps a good-faith attempt to remove unbridled discretion – and its inherent biases – from sentencing. *Compare State v. Lawson,* 2018-Ohio-1532, 111 N.E.3d 98, ¶ 20-21 (2d Dist.) (Froelich, J., concurring). However, "recidivism risk modeling still involves human choices about what characteristics and factors should be assessed, what hierarchy governs their application, and what relative weight should be ascribed to each." Hillman, *The Use of Artificial Intelligence in Gauging the Risk of Recidivism*, 58

The Judges Journal 40 (2019).

**{¶ 52}** The court's statement that the "moderate" score was "awfully high," given the lack of criminal history, could imply that the court believed there must be other factors reflected in the score that increased Saylor's probable recidivism. There is nothing on this record to refute or confirm the relevance of Saylor's ORAS score or any ORAS score. Certainly, the law of averages is not the law. The trial court's comment further suggested that its own assessment of Saylor's risk of recidivism differed from the ORAS score. The decision of the trial court is not clearly and convincingly unsupported by the record, regardless of any weight potentially given to the ORAS score by the trial court. Therefore, on this record, I find no basis for reversal.

Copies sent to:

Samuel Adam Usmani
Adam James Stout
Hon. Nick A. Selvaggio